*E-Filed 2/25/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN FRANCISCO RESIDENCE CLUB, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> HENRY A. AMADO, et al., <br><br> Defendants. _____/ | No. C 09-2054 RS <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I.  INTRODUCTION

Defendants' motion, much like the case, turns on a key question: were plaintiffs' membership investments in the White Sands Estates ("WSE") securities subject to the Securities Act of 1933? Defendants Ed Broda, Aspire Real Estate ("Aspire"), and Pacific West Securities ("PWS") argue the undisputed facts demonstrate that they were not.[1] Even assuming the investments *were* securities, moving defendants insist they were not statutory sellers. Finally, defendants argue the securities would have been exempt from the Act's registration requirement.

---

[1] Defendants Henry Amado, his company Abacus Financial Group, and White Sands Estates join the motion, insofar as defendants' broad arguments have relevance to the claims alleged against them. Where this Order refers to "defendants" or "moving defendants," it refers to Broda, Aspire and PWS.

For this reason, defendants ask for summary judgment on all claims that assume a violation of the Securities Act. In opposition, plaintiffs demonstrate that material issues of fact remain in dispute, thereby foreclosing summary judgment under any of defendants' three legal theories. Because plaintiffs have introduced no facts, in contrast, to dispute defendants' argument of a lack of connection to the O'Shea Trust or Tom O'Shea, their motion for summary judgment on claims brought by these plaintiffs must be granted.

In the alternative, defendants move for partial summary judgment on three of plaintiffs' state law tort claims. As described below, defendants' motion will be granted as to plaintiffs' unfair competition claim, but denied as to the two remaining claims. Defendants' motion was submitted without oral argument, pursuant to Civil Local Rule 7-1(b).

## II. RELEVANT FACTS

The plaintiff entities constitute overlapping family enterprises. SFRC is a California corporation operated by Kevin and Kate Donahue. Donahue, O'Shea, LLC, is a California limited liability corporation. Kevin Donahue, Kate Donahue and Anne (Donahue) O'Shea comprise its members. The third institutional plaintiff is the O'Shea Trust, managed by Tom O'Shea and his wife, Anne O'Shea. Tom O'Shea is the only individual plaintiff.

According to the First Amended Complaint ("FAC"), moving defendant Ed Broda advised Kevin Donahue of an investment opportunity in White Sands Estates in 2007. Broda, as founder and CEO of companies named Aspire Real Estate and Aspire Investments, acted as an investment adviser to the Donahues for a number of years and placed numerous investments—most of which involved real estate—on their behalf. By the year 2007, Broda and the Aspire companies had affiliated with defendant PWS. It was through PWS that Broda and the Aspire companies sold securities. Broda charachterizes his relationship to PWS as that of an independent contractor. He was required, by agreement, to funnel securities sales exclusively through PWS and to obtain that entity's authorization prior to any sale. Broda was also obligated to inform PWS if he engaged in outside business.

The SFRC plaintiffs aver that, after selling a piece of property in 2007, they became interested in finding a suitable new investment. In particular, they hoped to conduct a "like-kind" exchange, in compliance with Section 1031 of the Internal Revenue Code, to offset some of the tax consequences of the sale. Broda explains that he discussed several securitized investment options with Kevin Donahue. The parties recount what happened next differently. According to Broda, when the plaintiffs voiced a preference for a real estate investment, he referred them to co-defendant and developer Henry Amado. Amado is the founder of Abacus Financial Group and also one of the founding members of White Sands Estates. The White Sands company was formed to acquire and develop an unimproved 42.28 acre parcel of real estate in Kailua-Kona, Hawaii. Amado planned to develop the property, together with Gregory Fish of G.D. Fish & Associates. According to Broda, the referral essentially represented the extent of his involvement.

Plaintiffs tell a different story. They explain that Broda introduced Donahue and his family to Amado's project and advised that they invest in it. Plaintiffs claim Broda told Kevin Donahue the project would be profitable during the development stage and would provide a "coupon" return on investment of 12 percent per annum. At the end of two years, plaintiffs claim he predicted a full return on their investment as well as a constant percentage share in any profits generated by the sale of completed residential units. Plaintiffs also insist Broda assured them of Amado's expertise and skill. They contend they later learned that the WSE project was actually one of his first forays into real estate development. Plaintiffs claim it was their understanding that Broda's recommendation, like the investment advice he had given on prior occasions, was connected to PWS. As evidence of this, Kevin Donahue notes that in an e-mail Broda sent on August 17, 2007 regarding WSE, the legend stated: "Securities [are] offered through Pacific West Securities, Inc., Member NASD/SIPC." The parties agree, however, that no plaintiff had any direct contact with PWS to discuss WSE. The plaintiffs also never received any statements or documents relating to WSE from PWS or paid it any funds connected to the project.

The parties also agree that Broda arranged a conference call between Amado and Kevin and Kate Donahue on August 18, 2007. About a week earlier, on August 8, 2007, Broda e-mailed them

No. C 09-2054 RS
ORDER

3

a copy of an Executive Summary and a proposed Operating Agreement. That document described the project and represented that the most recent appraisal projected a value of approximately $19 million. It stated that WSE had the property under contract for $9,950,000. Plaintiffs point out that they later learned the $19 million figure was eclipsed by two more recent appraisals. Apparently, Amado received on October 4, 2007 an appraisal conducted in January of that year, valuing the property at between $11 and $15.69 million (depending on the length of a marketing campaign). On October 2, 2007, Amado received an appraisal conducted on September 17, 2007, valuing the property at $11.2 million. Plaintiffs contend they were never made aware—by Amado, by Broda, or by anyone—of these appraisals, despite the fact that WSE did not purchase the property until November 15, 2007.

Meanwhile, plaintiffs suggest Broda's involvement continued after the initial conference call, and even after the plaintiffs made their investment. Kevin Donahue avers that Broda participated in several conference calls, attended investor meetings, and was involved in efforts to obtain financing to replace a lender who apparently fell through. Plaintiffs claim they believed his continued attention reflected his role as an advisor, but suggest it also had to do with a payment he was set to receive from WSE. For support, they introduce an e-mail sent from Broda to Amado on November 9, 2007, to "formalize" a commission in the amount of five percent of equity raised. Also via e-mail to Amado, Broda stated that "hopefully [this is] the first of many significant milestones together!" Plaintiffs point out that WSE's general ledger lists an obligation to pay Aspire $199,948.27. Broda insists he was only ever actually paid $50,000. He characterizes this as a "thank you" gesture for his referral, and acknowledges that WSE owed him, in total, roughly $250,000. Plaintiffs assert that Borda solicited investments from several other individuals and corporations, and that his five percent commission reflects this activity. Broda counters that he only successfully secured funding from one other entity. No defendant knows how many offers Broda or the other defendants actually made.

Over the ensuing weeks and months, the Donahues, on behalf of SFRC, agreed to purchase for $2 million a ten percent undivided interest in the estate pursuant to a Tenants In Common

No. C 09-2054 RS
Order

4

("TIC") Agreement and a sixteen percent membership interest in White Sands Estates. They did so on October 27, 2007. White Sands Estates aimed to purchase the acreage with the plaintiffs' investment and through funds obtained from a series of loans from other entities. The primary loan was obtained from Kennedy Financing, Inc. for a principal amount of $7,000,000. Kevin Donahue acted on behalf of SFRC as a co-borrower under this loan. The company secured a second loan from another lender called FC Kona, LLC, for $756,000, and a third loan from the seller of the Kona property in the amount of $500,000. As these funds were still insufficient to cover the asking price, plaintiffs agreed to increase their investment. They suggest that through discussions with Amado and Broda, they were told that the property had increased in value due to successful regulatory proceedings, that all due diligence was completed, and that the project was "shovel ready." On October 27, the Donahue, O'Shea company purchased a four percent Class A membership interest and an eight percent Class B membership in White Sands Estates for approximately $1 million. White Sands Estates purchased the property on November 15, 2007, for $9,975,000 (plaintiffs insist the true purchase price was approximately $10,495,000). In June of 2008, the O'Shea Trust purchased for $382,537.96 a three percent membership interest as well as an undivided interest pursuant to a TIC Agreement. Defendants suggest that there is no evidence that Broda was involved in this final investment.

Broda insists that even if he did e-mail plaintiffs the WSE literature, the project was at that time not fully structured. The executive summary was marked as a "draft" and did not explain, for example, whether it was offering securities, common or preferred stock, TIC interests, or something else. He insists, then, that the Court should not consider it an "offering document." Instead, Broda suggests that plaintiffs and their attorneys helped structure the final form of their investments. Moreover, once the investments were made and the property purchased, Broda claims the plaintiffs helped structure the project's *future* investments, and could have insisted upon registration of the available TIC interests as securities, but did not. The plaintiffs counter that the developers were in charge, and presented plaintiffs with a power of attorney vesting control in Amado. As to the

plaintiffs' attorney, they insist he was able to suggest only modifications to documents memorializing the investments.

White Sands Estates was not able to service the debt on the Kennedy loan, is in default and currently in the midst of foreclosure. Property taxes remain outstanding. Also, according to the FAC, the entity is at least $11 million in debt, has failed to repay not only Kennedy Financing and all other lenders, but also owes fees to the retained architectural firm. According to the plaintiffs, White Sands Estates is insolvent and on the brink of collapse and their investments are worthless. Although they did receive one coupon payment in June of 2008, plaintiffs insist other payments currently due from WSE remain outstanding.

### III. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party who seeks summary judgment bears the initial responsibility of identifying the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, it shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the non-moving party presents evidence from which a reasonable factfinder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248-49.

### IV. DISCUSSION

Defendants move for summary judgment on four of plaintiffs' claims: (1) violation of the Securities Act of 1933 sections 12(a)(1) and (2); (2) violation of California Civil Code section 3372;

1  (3) unfair or fraudulent business practices, in violation of California Business and Professions Code

2  section 17200;[2] and (4) breach of fiduciary duty.

   1. <u>Tom O'Shea and the O'Shea Trust</u>

   All claims brought by Tom O'Shea and the O'Shea Trust against Broda, assume either the solicitation of securities or a historic business relationship.  It does not appear, however, that Broda or the other two defendants had any meaningful connection to these plaintiffs.  In their opposition and FAC, plaintiffs describe in considerable detail Broda's actions with regard to Kevin and Kate Donahue and point out that Broda sought out other non-party investors.  They introduce no evidence, however, that Broda had any connection to Tom O'Shea or the Trust's investment in the spring of 2008.  There is similarly an absence of any evidence that the moving defendants solicited these investments, or that the defendants were connected to them in any meaningful way. Accordingly, defendants' motion for summary judgment shall be granted on all claims as to these particular plaintiffs.

   2. <u>Section 12(a)(1)</u>

   a. Were the Investments Securities?

   Section 12 of the 1933 Act provides that "[a]ny person who . . . (1) offers or sells a security in violation of [Section 5 of the 1933 Act] . . . shall be liable . . . to the person purchasing such security from him."  15 U.S.C. § 77l(a) ("Section 12(a)(1)").  Section 5, in turn, forbids the offer or sale of unregistered securities in interstate commerce.  15 U.S.C. § 77e(a) ("Section 5").  On June 4, 2010, this Court denied plaintiffs' motion for summary judgment.  There, plaintiffs presented an argument inverse to the one here: they argued that the undisputed facts demonstrated that the investments *were* securities.  That Order found otherwise, concluding that material facts concerning the question were in dispute such that resolution at summary judgment was unavailable.

   That Order recognized that a TIC interest certainly may be consistent with an "investment contract" (which would make it a "security" subject to registration requirements), s*ee, e.g.*, *SEC v.*

---

[2] Plaintiffs also allege a violation of section 17500, which makes unlawful "false or misleading statements." Cal. Bus. & Prof. Code § 17500.  Defendants do not specifically address the section 17500 claim in their motion, and so it will not be discussed here.

NO. C 09-2054 RS
ORDER

7

*TLC Investments & Trade Co.*, 179 F. Supp. 2d 1149, 1158 (C.D. Cal. 2001), but that determining whether a TIC interest is an "investment contract" requires a fact-based inquiry into the intentions and actions of the parties. In *SEC v. Howey Company*, the Supreme Court instructed that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99.[3] As in the Prior Order, the parties' disagreement centers on competing conceptions of the plaintiffs' involvement. Defendants have introduced no new facts to define more clearly or clarify the parties' respective roles. Accordingly, without resolving factual disputes, it remains as impossible to define the investments as "not securities" as it was to define them as "securities."

b. Were Defendants Statutory Sellers?

Even assuming the investments were securities, defendants assert that Broda, Aspire or PWS cannot be found liable as statutory "sellers." The proffered reasons why differ by defendant. Broda argues all he did was refer an interested client he could not help to a developer. As a matter of law, he argues, this behavior does not amount to the solicitation of securities. PWS and Aspire insist the facts do not support plaintiffs' theory that they can be held vicariously liable for Broda's actions. Seller liability, as explained by the Supreme Court in *Pinter v. Dahl*, extends beyond those who pass title to a security. 486 U.S. 622, 641-655 (1988). Liability may also be imposed on those who *solicit* a purchase, so long as it is shown that they were "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Id.* at 647. The Court in *Pinter* also explained that "[a]n interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act . . . ." *Id.*

Turning first to Broda, plaintiffs present facts that contradict his explanation. As an initial matter, the money Broda received (and the money he stood to gain) indicates that his advice could

---

[3] The Ninth Circuit has distilled *Howey*'s definition into a three-part test requiring: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits produced by the efforts of others. *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (*quoting SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)).

No. C 09-2054 RS
ORDER

8

have been motivated by his own potential profit. Next, while plaintiffs view the Executive Summary Broda transmitted as promoting something more than an unformed investment scheme, they argue that even if it were nothing grander, the result would be no different. This is because, plaintiffs argue, Broda's involvement in the WSE project did not end with the referral in August. They insist he was deeply involved in the negotiations in the fall of 2007 leading up to plaintiffs' investment. The Donahues claim he, along with Amado, encouraged the Donahue, O'Shea company to augment SFRC's investment. Beyond this, plaintiffs say Broda solicited every other WSE investor, and made an unknown number of offers. If it is true, as Broda claims, that the nature of the investment developed with time into securities, plaintiffs insist Broda had a hand in that process. Of course, it may also be true that it was plaintiffs who masterminded the project's investment structure. Determining which version is more credible, however, is a task reserved for the finder of fact.

PWS and Aspire proceed to argue that plaintiffs' vicarious liability theory lacks any factual support and must fail as a matter of law. In their opposition brief, plaintiffs rely on *Hollinger v. Titan*, 914 F.2d 1564 (9th Cir. 1990), for the proposition that section "20(a) of the Securities Act . . . imposes control person liability upon actors such as PWS." (Pls.' Opp'n at 16:16-17.) In *Hollinger*, the Ninth Circuit explained that "control person" liability under federal securities laws reaches beyond what would be available at common law, via a respondeat superior theory (the distinction between an independent contractor and an agent, for example, is rendered meaningless), and is escapable only through a valid "good faith defense." *Id.* at 1576 ("A broker-dealer can establish the good faith defense only by proving that it 'maintained and enforced a reasonable and proper system of supervision and internal control.'") (*quoting Zwig v. Hearst Corp.*, 521 F.2d 1129, 1134-35 (9th Cir. 1975)). In *Hollinger*, the Court also specifically held that a "broker is a controlling person under [section] 20(a) with respect to its registered representatives," at least where the representative did not act "outside the broker-dealer's 'statutory' control." *Id.* at 1573, 1575 n.26.

While plaintiffs explain *Hollinger*'s import well, they ignore a very important fact. Plaintiffs have not actually *brought* a section 20(a) claim against either PWS or Aspire that seeks to impose

1  control person liability. They might have done so; indeed, the FAC *does* advance a section 20(a)
2  claim, but it is brought only against Amado. PWS and Aspire complain that plaintiffs are
3  attempting to sneak a control person liability claim into an opposition brief. In practice, the control
4  person standard is of course more stringent, but as discussed below, the distinction is not outcome
5  determinative here in any event.

6      *Hollinger* also explained that the traditional doctrine of respondeat superior applies to an
7  alleged violation of section 12(a)(1). "A broker-dealer may be liable for the acts of its registered
8  representatives if (a) the representative is acting within the scope of his or her relationship with the
9  broker-dealer and (b) he or she makes a statement with the actual or apparent authority of the
10 broker-dealer. *Fanelli v. Cypress Capital Corp.*, No. 93-20105, 1994 WL 725427, at * (N.D. Cal.
11 Dec. 29, 1994) (*citing Hollinger*, 914 F.2d at 1577 n.28). Here, the undisputed facts demonstrate
12 that Broda lacked actual authority: pursuant to agreements between PWS and Broda, Broda agreed
13 that he would only sell securities through PWS, that he would obtain PWS' approval for any
14 proposed sale, and that he would notify PWS of outside business activities. Broda readily admits he
15 did none of these things. Plaintiffs do not dispute PWS' insistence that it never even *knew* about the
16 WSE investment.

17     As to the question of apparent authority, the facts remain in dispute. An agent acts with the
18 apparent authority of a principal where: (1) the principal, by statements or conduct, intentionally or
19 negligently allows a plaintiff reasonably to believe the agent had authority to act; (2) in dealing with
20 the agent, the plaintiff was justified in acting in reliance upon a belief that an agency relationship
21 existed; and (3) in reliance upon the agent's apparent authority to act as agent, the plaintiff parted
22 with something of value. *Cypress Corp.*, 1994 WL 725427, at *6. "Apparent authority," moreover,
23 "depends on the conduct of the principal and not the conduct or representations of the agent." *Id.*
24 (citations omitted). Kevin and Kate Donahue were longterm clients of Broda's. Because he was
25 affiliated with PWS and because Broda was supposed to obtain approval for all securities sales or
26 inform PWS of outside business activities, plaintiffs argue there was no reason they should have
27 assumed this deal was different from all others Broda conducted through PWS. In a letter sent from
28

No. C 09-2054 RS
ORDER

10

PWS to the Donahues in October of 2006, PWS presented itself as (through Broda) their "financial professional," and promised "suitable investment recommendations." PWS presumably allowed Broda to include the statement, "Securities are offered through Pacific West Securities," in his professional e-mail. Accordingly, a reasonable factfinder could find that PWS—intentionally or negligently—implied that Broda was operating under its watchful eye, and that plaintiffs belief in this fact was reasonable.

Finally, Aspire appears to join PWS' vicarious liability argument. Aspire does not, however, present any legal or factual argument of its own that would establish, as a matter of law, that Broda did not act as an agent when he made the referral (or, as plaintiffs characterize it, the solicitation). Its motion also must be denied.

   c.  Were the Securities Subject to Exemption?

Defendants argue that, even assuming the investments were securities, they were exempt from the Act's registration requirements. Section 5 of the Act does not apply if the securities at issue are exempt from registration as a private offering, 15 U.S.C. § 77d(2) ("section 4(2)"). *See SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). To further the Act's purpose of ensuring full and fair disclosure of the character of securities, exemptions from registration provisions are construed narrowly. *Id.* at 641 (*citing SEC v. Blazon Corp.*, 609 F.2d 960, 968 (9th Cir. 1979)). Once a plaintiff introduces evidence that a defendant has violated the registration provisions, the defendant bears the burden of proving entitlement to an exemption. *Id.* (*citing SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)). The Ninth Circuit has adopted a flexible, four-part test for determining whether the private offering exemption under section 4(2) is available. The test considers: (1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the relationship of the offerees to the issuer. *W. Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984) (*citing Murphy*, 626 F.2d at 644-45). The party claiming the exemption must also show that it is met not only with respect to each purchaser, but also with respect to each offeree. *Id.* (*citing Murphy*, 626 F.2d at 645).

Although defendants leave the *Murphy* test unaddressed, plaintiffs point out that the first element—the number of offerees—is determinative. The Ninth Circuit has explained that section 4(2) requires that the defendant produce evidence of the exact number and identity of all offerees. *Id.* While the number of *purchasers* here is relatively small, defendants acknowledge that they have no idea how many offers were made. In his deposition testimony, Amado claimed that he distributed offering documents to a "small" number of individuals (including, but not limited to the plaintiffs) but retained records of neither the number of offering materials he distributed nor the identities of the receiving parties. Moreover, he explains that Broda and at least one other actor, Neil Toobin, participated in the solicitation of other investors. He did not monitor their communications, and does not know to whom either of these individuals distributed offering materials. In their motion, defendants do not address the number of offerees at all. On these facts, then, defendants have not met their burden of establishing the securities were subject to exemption.

3. Section 12(a)(2)

Section 12(a)(2) of the Securities Act allows purchasers of securities to sue "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication," containing a material misstatement or misleading omission. 15 U.S.C. § 77l(a)(2). Defendants assert the same three arguments detailed above to dispose of plaintiffs' section 12(a)(2) claim. For the reasons defendants' arguments for summary judgment on the section 12(a)(1) claim were unsuccessful, so too must they fail here. Except as to Tom O'Shea and the Trust, defendants' motion must therefore be denied.

4. California Civil Code section 3372

Plaintiffs allege that Broda violated section 3372 of the California Civil Code. That provision provides:

> Any person engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represents himself or herself to be an expert with respect to investment decisions in such property, or any class of such property, shall be liable to any person to whom such advisory services are furnished for compensation and who is damaged

> by reason of such person's reliance upon such services, for the amount of such compensation and for such damages, unless the person rendering such services proves that such services were performed with the due care and skill reasonably to be expected of a person who is such an expert.

The FAC alleges that it was Broda who gave poor investment advice, but did so while acting as the agent of Aspire and PWS. Broda, Aspire, and PWS argue they cannot be held liable, first, because the plaintiffs did not *pay* Broda for the advisory services. While Broda was promised a fee for his participation, he explains these funds would have come from Amado and WSE. This is a curious argument (particularly because it hints Broda's duty ran to Amado, at the expense of his long-standing clients) but it is belied by evidence that the funds would have come from WSE (Broda's fee, after all, appeared on the WSE balance sheet) and *did* proceed, albeit indirectly, from plaintiffs. Second, Broda asserts that he was not "in the business of advising," because plaintiffs lacked an "advisory contract" with either Broda, Aspire, or PWS. Defendants' promotional literature suggests otherwise. Aspire's website explained that "All of our professionals are involved members of the Tenants in Common Association," and emphasized how its "professionals are skilled in guiding accredited investors through the process of selecting the most appropriate replacement property." In a letter sent from PWS to Kate Donahue, that entity explained that she "should be provided with suitable investment recommendations based on [her] objectives, time horizon, risk tolerance and other factors . . . ." It also stated that, "[i]f seeking investment advice, you are responsible for providing accurate information about your financial status . . . to ensure that appropriate recommendations are provided." On these facts, then, a reasonable jury could find that Broda held himself out as an investment advisor for compensation, at least as to his clients Kate and Kevin Donahue (and the two corporations they controlled, SFRC and DOL). For the same reasons articulated in the prior section, the facts also do not preclude recovery on a respondeat superior theory of liability, and therefore the motion to resolve this claim at summary judgment must be denied as to *all* moving defendants.

5. <u>Unfair Competition</u>

No. C 09-2054 RS
ORDER

13

The moving defendants seek summary judgment on plaintiffs' unfair competition claim, brought pursuant to California Business and Professions Code section 17200.  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Civ.Code § 17200.  Accordingly, "[a]n act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).  To state a claim under the UCL, a plaintiff must allege that: (1) defendant engaged in one of the practices prohibited by the statute; and (2) plaintiff suffered actual injury in fact as a result of defendant's actions.  *See, e.g.*, *Laster v. T-Mobile United States, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005).  Plaintiffs argue Broda's conduct was both unfair and fraudulent.[4]  More specifically, they argue Broda failed to conduct appropriate due diligence and then failed to warn them against a poor investment.  They argue he concealed or helped conceal important facts about the developers, their lenders, and the true value of the investment, and that he did so because he stood to profit personally from their investments.

Broda relies on a California appellate decision, *Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777, 788 (2004), for the argument that plaintiffs cannot bring *both* their federal securities claims and a section 17200 claim.  In *Bowen*, the court looked to the purpose behind the state's unfair business practices provision and found that "section 17200 does not apply to securities transactions." *Id.*  There, plaintiff investors brought a UCL claim against a publicly traded Nevada corporation, alleging that several individuals, acting as the corporation's agents, defrauded investors by soliciting stock investments but failing to disclose material facts about the investments.  *Id.* at

---

[4] The appropriate definition of the word "unfair" in the UCL is unclear.  *In re Actimmune Marketing Litigation*, No. C 08-02376, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009).  In *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736-37 (9th Cir. 2007), the Ninth Circuit held that, "in the absence of further clarification by the California Supreme Court," district courts may apply either, or both, of the tests for unfair business practices articulated in *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999), or *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999), to determine if a defendant's conduct is "unfair."  As the parties completely ignore both tests, the Court assumes they rely on the standard for unfair business practices articulated in *South Bay*, and it shall be referenced here: "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 72 Cal. App. at 886-87.

1  779-81.  Faced with the question of whether the UCL applied to "securities transactions," the *Bowen*
2  court considered the UCL as the state counterpart to the FTC Act.  Because securities transactions
3  are not covered there, the *Bowen* court reasoned that they are also not covered by California's
4  counterpart.  *Id.* at 788.

5  Plaintiffs' UCL claim focuses on securities transactions, and it is difficult to distinguish
6  these facts from those in *Bowen*.  As plaintiffs point out, *Bowen* has since received criticism from
7  various federal district courts.  *See, e.g.*, *Benson v. JPMorgan Chase Bank, N.A.*, No. 09-5272, 2010
8  WL 1526394, at *7-8 (N.D. Cal. Apr. 15, 2010) (refusing to apply *Bowen* where plaintiffs UCL
9  claim targeted defendants' alleged aiding and abetting in violation of section 10(b)); *Strigliabotti v.*
10 *Franklin Res., Inc.*, No. C 04-0883, 2005 WL 645529, at *30 (N.D. Cal. Mar. 7, 2005) (rejecting
11 broad reading of *Bowen* and allowing plaintiff shareholders to bring UCL action against investment
12 advisors who allegedly charged excessive fees for advisory and administrative services); *In re*
13 *Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009) (limiting reach of *Bowen*
14 and allowing plaintiff investors to bring UCL action where investment firm allegedly deviated from
15 investment policies without obtaining proper vote).  It appears that federal cases refusing to apply
16 *Bowen* to the UCL all involved claims that did not target a securities *transaction*.  These courts
17 refused to rely on *Bowen* to foreclose any UCL claim, merely because the case involved securities in
18 a general sense.  This is a well-reasoned application of *Bowen*, and were the facts in this case
19 similar, this Court would follow suit.  Here, however, plaintiffs' theory unavoidably focuses on the
20 purchase of securities, and *Bowen* is determinative.  Defendants' motion is accordingly granted.[5]

21  6.  Breach of Fiduciary Duty

22  Broda, Aspire and PWS argue the uncontroverted facts demonstrate no defendant had a
23 fiduciary relationship with any of the plaintiffs.  In California, a plaintiff must show the existence of

---

[5] As with the other claims, plaintiffs seek to hold PWS and Aspire vicariously liable.  This plaintiffs cannot do.  An "unfair practices claim under section 17200 cannot be predicated on vicarious liability."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 808 (9th Cir. 2007).  "A defendant's liability must be based on his personal participation in the unlawful practices and unbridled control over the practices that are found to violate section 17200 . . . ."  *Id.*

a fiduciary relationship, its breach, and damage caused by the breach. *See, e.g.*, *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 224 (2007). As to the first requirement, "it is a 'long-settled rule' that a stockbroker owes a fiduciary duty to his or her customer." *Id.* (*quoting Brown v. Cal. Pension Admin. & Consultants, Inc.*, 45 Cal. App. 4th 333, 348 (1996)). Here, there is evidence that Broda acted historically as broker and advisor to Kate and Kevin Donahue, and that his investment advice extended to SFRC. While it is less clear that he actually acted as a broker to Donahue, O'Shea, LLC, the fact that the Donahues were also the individuals behind this entity suggests his advice to this couple would have extended to its welfare also. As to the remaining plaintiffs—Tom O'Shea and the O'Shea Trust—there is no evidence that Broda acted in a fiduciary capacity. Even if it were the case (although there is scant evidence to so indicate) that Broda encouraged them to invest in WSE, his fiduciary responsibility would not extend to plaintiffs. *See Apollo*, 158 Cal. App. 4th at 245 (rejecting breach of fiduciary duty where broker did not have prior relationship with plaintiffs and involvement was to solicit their investment in securities). For the same reasons articulated in the prior section, the facts similarly do not preclude recovery on a respondeat superior theory of liability.

   7.   <u>Damages</u>

Finally, defendants assert that all plaintiffs' claims must fail as a matter of law because they have not shown damages. Damages are an essential element of all of plaintiffs' claims, including the section 12 claims for rescission. *See, e.g.*, ("[S]ection 12 provides that a person who sells a security . . . 'shall be liable . . . to the person purchasing such security from him . . . [for] the consideration paid for such security with interest thereon, less the amount of any income received thereon, . . . or for damages if he no longer owns the security,' 15 U.S.C. § 77 l(a), [and so] there can be no recovery unless the purchaser has suffered a loss.") (*quoting In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002)).

Defendants insist damages are speculative, as foreclosure on the property in Hawaii has not yet taken place. They argue, then, that plaintiffs have not suffered a quantifiable "loss." Defendants point out that, however unlikely it may seem now, the foreclosure may not go through, or a swift

change in the Hawaiian property market might render plaintiffs' investments enviable. The point is well-taken. As it currently stands, plaintiffs still *hold* their interests. Defendants argue that, until they are sold, it is not accurate to say, as plaintiffs do, that they have lost the entire value of their investments. Nor is it really possible to estimate how *much* value they have lost. Plaintiffs do point, however, to at least one one quantifiable loss: plaintiffs were promised "coupon" income for preferred investors, but only received one payment (in June of 2008). Plaintiffs complain that, regardless of the outcome of the foreclosure sale, they cannot recover this income outside this litigation. While it is likely a small amount when compared to the full damages plaintiffs had hoped to recover, the coupon is at least a quantifiable damage. Plaintiffs also argue the reason WSE could not make these payments relates not only to Amado's inexperience and involvement with questionable lenders (facts plaintiffs insist their financial advisors should have warned them against) but also because Amado used the funds to pay himself and Broda. As the material facts do support plaintiffs' claim that they suffered some damages, defendants' motion must be denied.

## V.  CONCLUSION

For the reasons articulated above, the moving defendants' motion for summary judgment will be granted on all claims brought by the O'Shea Trust and Tom O'Shea. Their motion for summary judgment on plaintiffs' UCL claim will also be granted. Defendants' motion is otherwise denied.

IT IS SO ORDERED.

Dated: 2/25/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

No. C 09-2054 RS
ORDER

17